And our next case for argument is Spinelli v. the NFL and AP. Good morning, or good day, your honors, and may it please the court. Bill Ferranti for the plaintiffs' appellants here, the photographers in this case. And if I may give the court, please, to begin here, four basic propositions that really cut through all of the briefing in this case and give the court the basis for deciding almost everything that needs to be decided. Four basic propositions. Number one, you can't release someone else's claims on the 2009 to 2012 uses of my client's photographs by the NFL before there was even arguably any sublicense issued from the Associated Press. Those are not AP's infringement claims to release. That's Davis. Number two, whatever discretion AP may have to issue non-royalty bearing, which is to say free use licenses, if any, that discretion, it's not unfettered. AP's own words and deeds establish it's not unfettered. It's the Fischhoff case. You take their admissions, their lies, their self-dealing, their so-called efforts, not to mention plaintiff's reasonable expectations, that's a good faith claim. But what about the broad language of section four of the individual agreements, including sublicense language? Section four grants the Associated Press broad usage rights, broad sublicensing rights. Section 5.1 provides in exchange for those rights, AP will pay royalties. And now I'm shifting over towards the express breach of contract, which is a little bit different from the unfettered discretion question. On the express breach of contract argument, which is really the heart of the case, did plaintiffs ever agree that AP could just give away their photographs? What you find in section 5.1, it provides for royalty bearing sales of individual photos, qualified event photo sales. It provides for free use, I'm sorry, so individual photo sales. It provides for bulk rate sales. It provides for free use for thumbnails, free use for AP in its own marketing efforts, and a ban on subscriptions. But the basic license fee that your clients get is expressed in terms of a percentage of what AP gets. It is, Your Honor. Except for those of the clients who have a $25 minimum, right? So they may have a $25 claim per photo. But even those, I'm not sure that they, it's sort of an interesting depiction of what kind of photos count. But I'm not sure I'm seeing where the fact that AP has to pay a royalty in certain circumstances, that is mostly in terms of a percentage of what they get, requires AP to get something. I think that's exactly the issue, Your Honor. Is AP required to get something? Yes. Now AP's approach to this contract is that these criteria, these elements of a royalty bearing sale, a qualified event photo sale, which include things like collect cash, make individual photo sales, make photo sales through their online database, they're treating those like they're landmines. Isn't this basically a good faith claim? That is to say, suppose AP had offered this license to the NFL for a nickel or for $25? You'd still be making the same claim, wouldn't you? Not necessarily, Your Honor. I think there's a substantial difference between, I mean, if they'd offered it for a nickel per use, we'd have $25. That would violate. That wouldn't be, then you wouldn't have this issue about free complimentary whatevers. It would just be a question of were they operating in good faith, wouldn't it? I think there are two separate issues here that we're crossing back and forth over. I'm sorry, I'm trying to be a little more precise. So on the provision on Section 5.1, the nickel example, they have to pay the minimum royalty. If they want to sell the photographs for a nickel, they have to pay the minimum royalty. But the NFL doesn't have to pay anything because the NFL would have a valid license. Isn't that the situation? In that situation, if they're charging them, there's another problem here that should not get lost, which is that this is a discount subscription plan. What they've done is they've put all of AP-owned photos, all of plaintiff's photos, contributor photos, there's a few other categories. You can see these set out in the licenses that they've pushed into the record here. They're putting all of those in front of the NFL and saying, take your pick. Whenever you want, as many as you want, long-term, it's just like Netflix. They're not getting any revenue for that, though, AP is not. Correct. Except that they're not getting any cash directly for the use of our photographs. What they've done instead is set up this framework where they get the NFL license. They make a mince on being able to sell our photographs to other ... Do you know if that actually translates to increased income? I mean, essentially that they reached this agreement in 2009, I guess it's informal, but 2012, that necessarily translated to greater income? Your Honor, we're on the pleadings. We don't know for sure. What we know is to maintain control of the NFL license, which requires them to undertake quite a few burdens. They're undertaking, they're devoting staff, they're working through the archives, they're providing a photo store. They're providing a lot of services in exchange for the rights to take a piece of every photo sale. 60% of every sale they get to keep, and in exchange for that right, for having a stranglehold on all commercial photo sales ... When Hartford was negotiated, the AP images sales percentages was negotiated. I'm sorry, Your Honor, are you referring to negotiated between the NFL and AP? And with the individual photographers as well. No. We never agreed. I think that's a very important thing about this case, is we've negotiated for complimentary use, for free use for the NFL, four times. Talk about the AP images part of this. I'm not sure ... When they're sold to the Hartford Current, photographs taken by your clients ... Yes. ... and the Hartford Current pays AP for that, a portion of that goes to the photographer as well. Yes. And that was negotiated. Right. A portion of that goes to AP. What I was trying to get at is that they are collecting revenues on the backs of the contributor photo sales. What you're saying is it's a plausible pleading to think that if AP is negotiating, how much are we going to pay the NFL for the privilege of having this contract with them, right? Because the basic money flow is from AP to the NFL. But when they're negotiating how much, it's certainly plausible to think that if they can give away your client's rights for free to the NFL, and that's something the NFL wants, that AP would have to pay less, and is thereby enriched by not having to pay more dollars out of their pockets, but by giving the NFL something it wants from you guys. Exactly. That's the essence. And it seems to me, and I understand there are reasons why you want to be able to say the contract is ambiguous about zero-based things, because that lets you get in the evidence of the extrinsic fact that in the negotiations, your clients refused that very demand. But essentially, whether it's a nickel or whether it's free, since if they do have the right to give complementary licenses, and I would think they would, because there would be circumstances in which it might be in your interest as well to make a deal to give a cost leader to some particular agency. Maybe it's even in your client's interest to do this with the NFL, because the NFL is after all controlling their access, your client's access to things. But the question is, is AP acting in good faith when it gives a complementary license in a negotiation for which they're not really having to pay very much? They're giving up your client's rights, and maybe they got a better, sweeter deal for that. That would be, Your Honor. And I don't want to give up the express breach of contract. I think if you work through the terms, you can see there's nothing in there. The way Judge Sweet approached this is there's no bar on giving free use. I would say there's no approval. We both have legitimate arguments for an admission. I think ours is better if you parse the terms and what's actually provided and look at the structure of the contract as a whole. But at a minimum, it's a silence case. You're in ambiguity land. But as Your Honor focuses on, we also have this good faith claim, this alternative claim. And what AP did, I know I'm over time. If you don't mind, Your Honor. I can address that issue, sure. Thank you. What AP did, in 2009, we tried to negotiate this. We tried to negotiate for free use, because it was an issue with Getty. We knew the NFL wanted it. And so we said, when AP gets the license in 2009, let's talk about the terms of complementary use for the NFL. And AP says, no, we don't want it. Because we're being required to give the NFL, our AP-owned photos for free. We want to make up the money on the backs of yours. We don't want it. Three years later, when... How does that affect the way... If you knew it at the time and signed the individual photographer's agreements, your eyes were open. We knew that they weren't going to give this usage, and that it wasn't provided for in the contract. We proposed language to put it into the contract to negotiate over the terms of it. And they didn't want to negotiate this. It's not in the contract. We don't want it. And that's the other factor here, Your Honor, is they have repeatedly shown, in their words and deeds, that this was not part of the contract. And to be very clear, nobody has signed a new version of the agreement. In 2012, when the infringements came to light, we approached the Associated Press. And what does AP say about this issue? They say, let's negotiate for that right. They tell Plaintiff Boehm, who hadn't signed the 2009 version yet, sign this contributor agreement, but just so you know, we're going to negotiate a new one, because the NFL is now demanding free use. We have to give it to them. We've got to figure it out. They spend four months negotiating for it. And the other important point here, Your Honor, is they're also telling the NFL at the same time, in the 2012 AP-NFL agreement, that they say that AP has or will promptly secure the free use. This is what they're telling the NFL in 2012. So they're telling everybody, we need to acquire this right. We don't have it yet. This is exactly what happens in Fischhoff. Can I ask you about the fraud claim? Sure. Because essentially in 2009, there's no agreement, at least according to what you've said. In 2012, there is a representation, an agreement, but then your eyes are open. By that point, you're aware fully that, in fact, there was going to be this disclosure. So my question is, where's the false representation? Where's the reliance to actually warrant a fraud claim? Sure. Your Honor, so the fraud claim is based principally on the misrepresentations in 2009. Because again, there was no new agreement signed in 2012. They spent four months negotiating for the new agreement to get this right that they didn't already have. And they come down, they finally get sick of negotiating, and say, here it is, opt in, opt out. We didn't do either. We sent a letter saying cease and desist, and we'll see you in court. So the fraud claim is based on 2009, when they're making representations that they absolutely will not be allowing the NFL for use, and then letting it happen anyway. The 2012 agreement between the AP and the NFL had that language, though, right? It did. Now, there are a couple problems with that, though, Your Honor. To be clear, and we haven't talked about this, but the retroactive part of that license is completely invalid under Davis. Now, we have, I mean, setting aside the agreement. I thought it was the first thing you said, was they're not allowed to give away accrued rights that belong to the copyright holder for whatever infringements there had been. And a retroactive license is effectively trying to compromise or surrender claims that already existed because there was not, if there was not a license at the time. Right. Now, and that is prior to any question about, I mean, even prior to good faith, prior to the breach of contract, for the core infringement claims in this case against the replay and against NFL, we don't need to worry about the agreement. There is no, there's no license. These are just unlicensed uses. Now, for the NFL, what happens, so what happens is when these infringements come to light in early 2012, AP secretly negotiates this retroactive license. And under Davis, they try to, Davis says, we hold that a license or assignment in copyright can only act prospectively. They try to say this isn't the holding of Davis somehow because of the co-owner, co-owner versus single owner. I know you've addressed Davis extensively in the, in the briefing, but your time's expired. Why don't we hear from you with your rebuttal after we hear from the other two lawyers? Thank you, Your Honor. Mr. Deutsch. Yes, Your Honor. Thank you. May it please the court, Andrew Deutsch for AP, but speaking for all defendants with respect to the non-antitrust claims. I want to start out by correcting a very serious misimpression left by counsel for plaintiffs. AP's interests and the photographer's interests are entirely aligned on these contracts. If AP doesn't sell a license, AP makes no money at all on this deal. AP, however, is required under its agreements with the NFL, which are part of this record, to pay the NFL a minimum royalty of over a million dollars as of 2009, and that has doubled each year up through today. If AP doesn't sell royalty bearing license, that money comes out of AP's pocket. AP did not profit in any respect off the backs of the photographers. Wait, wait, wait.  There's a negotiation over that fee, right? It's a million dollars, but it could have been $900,000. It could have been a million three, right? It was a contract that was put out for bid. The NFL said we— I understand. I understand. But whatever the amount is, the amount goes up or down. No, the amount only goes up. There is a minimum royalty that goes up every year under these three contracts. Yeah, I get that. But that was set in terms of a bargain between AP and the NFL, right? Yes, Your Honor. And it could have been set otherwise. It could have been set lower. It could have been set higher. There really was no negotiation. These were the terms put to AP by the NFL when the contract was put out for bid, which it was done three times. This is not negotiated in the same sense that the contracts with the photographers were. What the contracts show is the hands of the photographers' lawyers. They were represented in negotiation with the AP. They were able to negotiate certain exceptions to the concept of this revenue sharing, but they were not able to negotiate either a restriction on non-royalty-bearing licenses or a restriction on retroactive versus prospective licensing. And the principle that this Court said in Boosie v. Hawks and most recently— AP also has photographers who work for them on contracts. And they are under the same situation. They have to let the NFL use those photos for free. AP gets no advantage here whatsoever over the plaintiff photographers. That needs to be quite clear. There is no secret money being made here. The contracts say what they say. If AP doesn't sell royalty-bearing licenses, this is a substantial money loser for AP. With respect to the copyright issue, as we have said, the plaintiffs in their second amended complaint acknowledged that from the day they signed their agreements and uploaded their photographs to the AP imaging system, AP knowingly allowed the NFL to use and facilitated the use. That is language of prospective licensing. AP having these broad license rights and granting a non-exclusive license that does not have to be in writing, that's it. They basically admitted their way out of the Davis v. Blige issue, and it's a basis on the substantial split that exists in the district court. But if the court does address it, it's clearly the case, as four district judges, including Judge Sweet, ruled, that Davis v. Blige doesn't apply where you don't have a co-owner that doesn't consent. We have plaintiffs who are sole owners, who did consent to and did not ask for restrictive language, and the language clearly permits AP to grant royalty-free licenses, and it clearly permits it to grant licenses that cover any period in which AP itself holds a license, which would certainly include this 2009 to 2012 period. The contract is not ambiguous. It contains all the necessary terms, and the district court was correct in not being distracted by efforts to bring in parole evidence, particularly in a contract where there is a merger clause. With respect to the question of good faith, Your Honor, I hope I've addressed that. AP had every motivation to sell licenses. In fact, the plaintiffs acknowledge in their second amended complaint that the only entity that got a non-royalty bearing license was the NFL. The plaintiffs themselves had made well over a million dollars as of 2014, and they've made much more. They each had contracts that allowed them to cancel on 30 days' notice, and none of them ever exercised this. And there are more than two dozen other photographers, also independent contractors, with the same kind of contracts, who did not sue. I think the point simply is that the district court considered at great length and with great care each of the arguments made by the plaintiff with respect to contract and copyright, appropriately rejected them, and the Court should affirm. Do you wish, Mr. Mishkin? Thank you. May it please the Court, Jeffrey Mishkin for the NFL Defendants. With the Court's permission, I would like to devote only a minute or two to the copyright claims against the NFL and spend the rest of my time on the antitrust issues. Under copyright law, an authorized use of copyrighted material cannot give rise to a claim of infringement, and the complaint here alleges, and there really is no disagreement at all, that AP authorized every use of these photographs made by the NFL. Now, we understand the photographers say they should have been paid a royalty by AP for that use, but that is a question only of contract between AP and the photographers. As to that issue, the NFL is on the sidelines. We're not involved. However, that contract dispute may be resolved, whether or not AP should have paid royalties to the photographers for the uses made by the NFL for editorial and marketing purposes. Our uses were authorized, and because of that, the copyright claim does not lie against the NFL. As to the antitrust claims, we haven't heard anything about that yet. There are two categories of agreements that are attacked as antitrust violations. First is the agreement among the 32 NFL teams to collectively market their jointly owned IP in game action photographs, and second is the licensing agreements between the NFL and AP. We believe Judge Sweet got this exactly right. The antitrust claims here are deficient as a matter of law on many, many grounds. Let me just start with two basic antitrust deficiencies that cut across both categories of agreements that are attacked. First, the absence of a plausible allegation of antitrust injury, and second, the absence of a plausible allegation of a relevant market. Now, antitrust injury is a necessary element of any Section 1 claim. It's an antitrust cliche that the antitrust laws are designed to protect competition, not competitors. And so to avoid dismissal, an antitrust complaint must allege sufficient facts to show an injury to competition in a relevant market, not just a personal economic loss. Here, the alleged injury is nonpayment of royalties under a contract. That is not antitrust injury. Essentially, what you're suggesting is there's no impact on competition. That's correct, Your Honor. We lost money on a personal contract between the photographers and AP. That may be true, that may not be true. It has nothing to do with competitive conditions in a relevant market. And let me turn to that question now of a relevant market. A proposed market under the antitrust laws is not plausible if it fails to include all reasonable substitutes for the product at issue. Here, plaintiffs say the product at issue is, I'm quoting them, commercial licensing of NFL related stock photographs. So, plaintiffs are proposing a single brand market confined only to NFL related photos. Single brands are almost never sufficient to constitute a legally cognizable market under the antitrust laws. Plaintiffs say here that the NFL photos ought to be considered a market unto themselves, because as they put it, the NFL is the most popular and lucrative professional sports league in the United States. That may be true, but it's not a sufficient allegation of a relevant market. The complaint here contains no facts to support the conclusion that photographs of NFL games are so unique to commercial sponsors for advertising purposes, that those sponsors would not find the photographs of at least the other sports to be reasonable substitutes if there were an increase in the price of NFL photos. So to illustrate that, if a commercial sponsor, like General Motors, wanted to advertise cars to people in New York City, and its first choice was to use photos of NFL Giants games, let's say. The complaint asserts no facts as to why, if the price of photos of Giants games became too expensive, General Motors could not reasonably turn to photographs of Yankee games, or Knicks games, or Rangers games to advertise its products to potential customers. In fact, plaintiffs say that they themselves, they allege in the complaint, that they take photographs of other sports for the very same purpose of selling them to the same commercial advertisers. And I think it's just really a matter of common experience, and goes to plausibility of the market. That commercial sponsors will advertise on more than one sport. The point, General Motors is not simply trying to reach football fans. They're trying to reach car buyers, and they can do that in a lot of ways. Your Honor, beyond the absence of antitrust injury, and I see that I'm over my time. And unless you wish to hear more from me, I'm prepared to sit down. I think we're in good shape. Good, thank you. Thank you very much. And Mr. Fronte, you have a couple minutes. Thank you, Your Honor. I'd like to cover Implied License Davis, and if we have time, antitrust. With all due respect to Mr. Mishkin, our reply brief covers all the points that he raised. On implied license, they're arguing that there's by conduct an implied license between the NFL and AP in 2009. They pushed into the record the 2009 agreement between AP and the NFL, which says on page 62 of the confidential appendix that it will remain, it's a written agreement, it will remain in force unless and until a new written agreement is executed. It's between the same parties for the same photos, and this indisputably does not provide for uses that we are challenging as infringement. So when does the implied license arise? Is it the first time they steal a photo, the fifth time, the thousandth time? This is a factual question. They're embracing that our allegation AP knew about the uses and ignoring all of the allegations that AP knew it didn't have authority to issue a license. An implied license is still a license, it's still a contract, you still have to have a meeting of the minds. And again, that 2012 contract, it specifically agrees between AP and the NFL that they have or will promptly acquire this right. You don't agree to that if you already had the right and indeed licensed it three years prior. There's also no excuse for them to have not raised this argument earlier. This is supposedly on the face of the pleadings. As a gotcha argument, raise it in the district court. If there's any truth to it, you raise it in the district court. The court should not go near this argument. Also, this is like Paul McCain. There's evidence of custom in a use first, license later approach. And Judge Rakoff said that's infringement, looking the other way is infringement. That's what we pleaded, and that's the important critical point. This is a pleading case. Now on Davis, none of these other cases, the southern district cases they rely on, two of them are actual agency cases. In this case, they themselves rely on section 1.3 of the contributor agreements. They're not our agent. They can't forgive infringement claims for the plaintiffs when they're not our agent. 4.1 reserves ownership to the plaintiffs, not to them. We're the only one who can sue. Can I make one more point, your honor? If AP does nothing in 2012, if it doesn't issue the retroactive license, where are we? Plaintiffs have tens of thousands of infringement claims. What they did was release those claims. Davis isn't a co-owner, co-owner case. It's a don't release someone else's rights case. I'd be pleased to address the antitrust issues, but I understand it's been a long morning. I leave it to the court. You've been adequately discussed in your papers, so we've certainly got the privilege of those. But thank you, all three of you, and that is our final argument for today. So we'll ask the clerk to adjourn court. Court is adjourned.